AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

AUG 1 5 2019

MITCHELL R. ELFERS
CLERK

# UNITED STATES DISTRICT COURT
## for the
### District of New Mexico

In the Matter of the Search of            )
*(Briefly describe the property to be searched*  )
*or identify the person by name and address)*   )        Case No.  19mr971
                                          )
ROOM 310-A AT BEST WESTERN PLUS           )
MONTEZUMA INN & SUITES, 2020 N. GRAND AVE,)
LAS VEGAS, NM 87701                       )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
  Robert Corbin Padilla, see Attachment A

located in the _____ District of _____New Mexico_____ , there is now concealed *(identify the person or describe the property to be seized)*:
  Robert Corbin Padilla, and see Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
  ☑ evidence of a crime;
  ☑ contraband, fruits of crime, or other items illegally possessed;
  ☑ property designed for use, intended for use, or used in committing a crime;
  ☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Sections 841 & 846 | Possession with Intent to Distribute, and Distribution of, Controlled Substances, and Conspiracy to do the same |

The application is based on these facts:
  See Attached Affidavit

  ☑ Continued on the attached sheet.
  ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
    18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

By telephone by Thomas D. Long
*Applicant's signature*

Thomas D. Long  Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
___Telephone (phoned from Las Vegas, NM)___ *(specify reliable electronic means)*.

Date:    08/15/2019

*Judge's signature*

City and state:  Albuquerque, NM          The Honorable Jerry H. Ritter, U.S. Magistrate Judge
                                          *Printed name and title*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF ROOM 310-A AT BEST WESTERN PLUS MONTEZUMA INN & SUITES, 2020 N. GRAND AVE, LAS VEGAS, NM 87701** | Case No. _____<br><br>*FILED UNDER SEAL* |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Thomas D. Long, a Special Agent with the Drug Enforcement Administration, United

States Department of Justice, being duly sworn, do depose and hereby state the following:

### INTRODUCTION

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a warrant to search Room 310-A, at Best Western Plus Montezuma Inn

& Suites, located at 2020 N. Grand Ave., Las Vegas, NM 87701 ("the **HOTEL ROOM**").  The

**HOTEL ROOM** is believed to be occupied by Robert Corbin PADILLA, as is further described

in Attachment A. Agents seek a warrant to search the **HOTEL ROOM** for the things described in

Attachment B. Based on the facts set forth in this affidavit, there is probable cause to believe that

violations of 21 U.S.C. § 841 and 21 U.S.C. § 846 have been committed by Robert Corbin

PADILLA (hereinafter referred to as "PADILLA"), and that information and items the government

may rely upon to establish those violations are contained within the **HOTEL ROOM**.

### AGENT BACKGROUND

2.      I am a Special Agent ("SA") with the United States Drug Enforcement

Administration ("DEA"), United States Department of Justice, and have been so employed since

September 2017. As such, I am a law enforcement officer of the United States within the meaning

of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

3.      To become a DEA Special Agent, I graduated from the DEA Academy, Basic Agent Training, in January of 2018. The program is 19-weeks and covers all aspects of investigating drug trafficking cases. I received training on surveillance and counter-surveillance operations, undercover operations, confidential source operations, criminal law, and investigations involving federal electronic surveillance statutes, to include Title III wiretaps, drug identification, search warrant executions, and vehicle stops.

4.      My experience as a Special Agent includes, but is not limited to, conducting surveillance, interviewing witnesses, writing affidavits for and executing search warrants, and working with undercover agents and informants. I have received training and have experience in the investigation of violations of the Federal drug and money laundering laws, including the offenses listed below. I have participated in the investigations of drug trafficking conspiracies, including via Title III wiretaps. I have also been the affiant, and supervising agent, of multiple Title III wiretap investigations. As a result, I am familiar with matters including, but not limited to, the means and methods used by persons and drug trafficking organizations ("DTO") to purchase, transport, store, and distribute illegal drugs, and to hide profits generated from those transactions. I also have experience in analyzing and interpreting drug codes and cryptic dialogue used by drug traffickers.

5.      Prior to my employment with the DEA, I served for six (6) years as a member of the New Mexico State Police ("NMSP"). As a member of the NMSP, I received training, and obtained experience, in the investigation of violations of the New Mexico State Criminal and Traffic Statutes, to include drug-related crimes. Also, as an NMSP Officer I served as a pilot, flight

2

instructor, and commander of the NMSP Aircraft Section, within the organization's Special Operations Bureau. In that capacity I provided aerial support for, and participated in, numerous criminal investigations, narcotics operations, tactical team support, search and rescue operations, border security, to include surveillance of drug importation, and airborne patrol missions.

6.      I have encountered and become familiar with various tools, methods, trends, and paraphernalia and related articles utilized by traffickers in their efforts to import, conceal, manufacture and distribute controlled substances. Central to all trafficking efforts, regardless of the drug, is the trafficker's effort to make a profit from those dealings or transactions, either for the purchase of additional substances or material gain. I have been actively involved as case agent of investigations and have talked with confidential informants involved in the trafficking of narcotics, and this has formed the basis of my opinion.

7.      As a result of my training and experience, I am familiar with how various drugs are used and the typical distribution and trafficking methods used by drug dealers and traffickers. In addition, I am also familiar with the typical methods used by traffickers to "courier" and clandestinely transport controlled substances through airports and by common carriers such as the U.S. Mail, small parcel carriers, and freight services.

8.      This case is being investigated by the DEA. I have participated in the investigation of the offenses described below and make this affidavit based on my participation in the investigation, and based on reports and information made available to me by other agents and Task Force Officers ("TFOs"), as well as other law enforcement authorities.

9.      The facts set forth in this affidavit are known to me as a result of my investigation and interviews with other agents and law enforcement officers.  These are not all the facts known to me throughout the course of this investigation, but rather only those that are essential to establish

3

probable cause in support of the search of the **HOTEL ROOM** believed to be occupied by PADILLA, as detailed below.

## EVIDENCE SOUGHT DURING SEARCH

10.     Based on my training, experience and participation in this and in similar investigations, I believe that individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking activities in their vehicles. This evidence which is discussed in detail in the following paragraphs includes controlled substances, paraphernalia for weighing, packaging, and distributing drugs, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

11.     Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution. The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances. Drug dealers commonly store these items in their vehicles.

12.     Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators. These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers. These items are stored

4

by drug dealers on their person or in their business, residences, and in vehicles. I also know that drug dealers will often use hotel rooms to conduct activities related to their drug trafficking. Agents have documented the practice by another drug dealer in this investigation. Agents believe drug dealers use temporary hotel rooms to evade law enforcement and to ensure other drug dealers, suppliers, and customers do not learn the drug dealers' home address.

13.    Other evidence of transportation, ordering, possession and sale of drugs can include the following:  telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by drug dealers on their person or in their business, residences (including temporary hotel rooms), and vehicles.

14.    Drug traffickers usually sell their product for cash. Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory. In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

15.    Individuals involved in drug trafficking and distribution often try to legitimize these profits from the sale of drugs. To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious. They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This

evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

16.     Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media. The above items are typically kept by drug dealers on their person or in their businesses, residences, and vehicles.

17.     Information stored in electronic form on all computers and other computer-related digital media can provide evidence of drug trafficking and the identity of associates. For example, numbers stored in the telephones (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates. Cellular telephones and other communication devices can contain similar information.

18.     Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs. They usually maintain these photographs and/or videos on their person or in their businesses, residences (including temporary

hotel rooms), vehicles, on computers, on smartphones, or in the residences of friends or relatives. Digital still and video cameras are commonplace and may be used to record digital photographs or videos. All can be stored in computer hard drives and related digital media.

19.     Drug trafficking is a dangerous and violent endeavor, therefore subjects involved in illegal drug trafficking often utilize firearms in the course of conducting their illicit business. Firearms often employed for intimidation, to commit violent acts, and to avoid arrest by law enforcement officers. Agents intend to search, and seize, any and all firearms and ammunition that may be found.

20.     Subjects will leave behind fingerprints and DNA evidence in vehicles they operate, as well as drug residue, gun powder residue, and other physical evidence. Agents intend to search for fingerprints, deoxyribonucleic acid ("DNA") samples, evidence of the presence of drugs, gun powder residue, and other elements of physical evidence that may be present.

21.     A list of items agents seek authority to seize is in Attachment B.

### COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

22.     As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found in the **HOTEL ROOM**, in whatever form they are found. Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on computers and other storage media such as a computer hard drives, external hard drives, thumb drives, secure digital cards and other types of flash memory cards, compact disks and floppy disks, personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones. For this reason, I submit that if a computer or storage medium is found in the **HOTEL ROOM**, there is probable cause to believe those records will be stored on that computer or storage medium. Thus, the warrant applied for would authorize the seizure of electronic storage media or,

potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

23.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a vehicle for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the vehicle, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

  a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on-site could be unreasonable. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

  b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a

search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

24. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying computers and/or storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## PROBABLE CAUSE

25. The primary target of this investigation, Robert Corbin PADILLA, is extremely surveillance conscious and employs very effective counter-surveillance techniques in an attempt to thwart law enforcement tactics. In the course of this investigation agents have secured multiple Title III authorizations[1] for wire and electronic surveillance over six (6) cellular telephones used

---

[1] These orders authorized the interception of wire and electronic communications over six (6) different phones used by PADILLA, a phone used by a suspected PADILLA DTO member, a phone used by a suspected methamphetamine source of supply, and a home security camera system.

by PADILLA. Interceptions over these target telephones have also revealed that PADILLA conducts drug trafficking activities at 8407 San Juan Road NE; Albuquerque, NM 87108-2425.

26.     Through our investigation, agents have learned that PADILLA is a leader of a drug-trafficking organization operating in New Mexico ("PADILLA DTO"), including the distribution of cocaine, crack cocaine, heroin, methamphetamine, and oxycodone/fentanyl pills. The police department in Las Vegas, NM believes PADILLA is the main source of illegal drugs in city of Las Vegas and that 70% of the cocaine, heroin, and methamphetamine that comes into Las Vegas, NM is sourced by PADILLA. Agents believe PADILLA uses a Mexican national as one of his sources of supply. During the course of this investigation, agents have obtained evidence of the drug conspiracy through surveillance, arrestee interviews, confidential source ("CS") statements, previous CS controlled purchases, interception of electronic and wire communications, and other investigative techniques. Investigators have also developed probable cause through financial inquiries to believe PADILLA and his co-conspirators are engaged in the laundering of monetary instruments.

### *Confidential Source Controlled Purchase – March 30, 2019*

27.     On March 30, 2019, PADILLA distributed cocaine to a confidential source ("CS"), in violation of 21 U.S.C. §§ 841(a)(1) and 21 U.S.C. §§ 841(b)(1)(C). Before the CS met with PADILLA, agents searched the CS, and the CS's vehicle, to ensure no contraband was present. Agents then provided the CS with $6,000 in Official Advanced Funds ("OAF"). At PADILLA's direction, the CS drove his/her vehicle to a location near PADILLA's residence, located at 8407 San Juan Road NE; Albuquerque, NM 87108-2425. The CS was under continuous surveillance until he/she met PADILLA at the directed location. PADILLA arrived at the location driving a 2008 Black GMC Yukon XL, bearing New Mexico ("NM") License Plate Number AJLY13 and

VIN: 1GKFK66818J252516, registered to Robert Corbin PADILLA at 8407 San Juan Road NE; Albuquerque, NM 87108-2425. PADILLA picked up the CS in the Yukon, and drove the CS to 8407 San Juan Road NE; Albuquerque, NM 87108-2425. While at 8407 San Juan Road NE; Albuquerque, NM 87108-2425, PADILLA sold the CS a bag containing a white powdery substance, suspected to be cocaine, in exchange for the $6,000 in OAF. While the CS was with PADILLA, agents maintained surveillance – although not continuous – over both the CS and PADILLA. During the meeting, agents were monitoring a live audio feed from a microphone/recorder worn by the CS. Once the exchange concluded, PADILLA drove the CS back to the CS vehicle, in the Yukon, and dropped the CS off. From that point, agents resumed surveillance of the CS until meeting with the CS at separate location. At that meeting, the CS, and the CS vehicle, were both searched again to verify the CS had no additional contraband or money, and the CS provided agents with the bag containing the suspected cocaine.

28.  The white powdery substance obtained from PADILLA, by the CS, was transported to the DEA Albuquerque District Office ("ADO") and was field tested by agents, yielding a presumptive positive result for cocaine. The suspected cocaine obtained from PADILLA was sent to the DEA South Central Laboratory in Dallas, Texas on April 2, 2019. On April 29, 2019, the DEA South Central Laboratory issued a Chemical Analysis Report, for the substance purchased from PADILLA on March 30, 2019, that indicated the substance was identified as cocaine hydrochloride. The net weight of the cocaine was 167 grams +/- 1 gram and the substance purity of the cocaine hydrochloride, as stated on the Chemical Analysis Report, was 83% +/- 4%.

29.  At the time of the controlled purchase, the CS (who was a drug trafficker and had previously sold to undercover officers on a number of occasions), was assisting DEA agents for consideration on potential criminal charges. After the controlled purchase on March 30, 2019, the

CS successfully assisted agents on another investigation by introducing an undercover officer to another drug trafficker. Subsequent to this event, case agents suspected the CS was violating the provisions of his/her agreement with the DEA by continuing to engage in drug trafficking without DEA authorization. Based upon that suspicion, case agents ceased using the CS to conduct controlled purchases on behalf of the DEA.

### *PADILLA's Residency at 8407 San Juan Road NE, Albuquerque, NM*

30.     Agents last observed PADILLA at 8407 San Juan Road NE; Albuquerque, NM 87108-2425 in April of 2019. At the end of April 2019, agents observed a portable storage unit in the driveway of 8407 San Juan Road NE; Albuquerque, NM 87108-2425. In May of 2019, Public Service Company of New Mexico ("PNM") service was initiated in the name of Consuelo MARTINEZ at 8407 San Juan Road NE; Albuquerque, NM 87108-2425. Subsequent to this time, agents did not see PADILLA or any of his vehicles at 8407 San Juan Road NE; Albuquerque, NM 87108-2425. Agents were also aware of the fact that PADILLA's girlfriend, Sharlett M. MARTINEZ, was expecting to deliver a baby conceived with PADILLA in July of 2019. Agents, therefore, believe that PADILLA may have relocated to MARTINEZ' house in Las Vegas, NM. This theory was confirmed by local law enforcement officers in Las Vegas, NM who reported seeing PADILLA in Las Vegas in July of 2019.

31.     Nonetheless, agents now believe that PADILLA has resumed using 8407 San Juan Road NE; Albuquerque, NM 87108-2425, as well as the house next door at 8411 San Juan Road NE; Albuquerque, NM 87108-2425. Ownership data derived from the Bernalillo County Assessor indicates that PADILLA's grandfather is the listed owner of the property at 8407 San Juan Road NE; Albuquerque, NM 87108-2425, however PADILLA lists that address on his New Mexico Driver's License and Vehicle Registration records as his residence. Bernalillo County Assessor

records also indicate the house next door, at 8411 San Juan Road NE; Albuquerque, NM 87108-2425, is owned by PADILLA.

32.     On August 3, 2019, agents observed a Black 2016 Chevrolet Corvette, bearing NM license plate number 06178UNM, parked in the driveway of 8411 San Juan Road NE; Albuquerque, NM 87108-2425. Agents believe that PADILLA is driving this Corvette, and has been seen by local law enforcement officers in Las Vegas, NM using this vehicle. The Black 2016 Corvette is registered to Charles CASTILLO at 8619 Gunnison NW; Albuquerque, NM.

33.     On August 4, 2019, agents observed the same Black 2016 Chevrolet Corvette (bearing NM license plate number 06178UNM) parked in the driveway of 8411 San Juan Road NE; Albuquerque, NM 87108-2425. Additionally, agents also noted the house lights were on, despite the fact PNM records show that power service is currently disconnected from 8411 San Juan Road NE; Albuquerque, NM 87108-2425.

34.     On August 5, 2019, agents observed the Yukon parked on the street directly in front of 8407 San Juan Road NE; Albuquerque, NM 87108-2425. Additionally, agents observed a Red 2013 Jeep Grand Cherokee, bearing NM license plate number 627 WCA, parked in the driveway of 8411 San Juan Road NE; Albuquerque, NM 87108-2425. The Red 2013 Jeep Grand Cherokee is registered to PADILLA's girlfriend, Sharlett M. MARTINEZ.

### *Recent Enforcement Activity*

35.     On August 6, 2019, the Honorable Jerry H. Ritter, United States Magistrate Judge for the District of New Mexico, signed a search and seizure warrant (19-MR-935) authorizing the search of 8407 San Juan Road NE; Albuquerque, NM 87108-2425. On that same date, Judge Ritter signed a search and seizure warrant (19-MR-936) authorizing the search of 8411 San Juan Road NE; Albuquerque, NM 87108-2425. Also on the same, Judge Ritter issued an arrest warrant for

PADILLA based on a criminal complaint alleging a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). For operational concerns, neither search warrant has been executed yet.

36.     On August 8, 2019, Judge Ritter signed a warrant authorizing DEA agents to receive prospective location data from AT&T regarding the location of one of PADILLA's phones. Agents began receiving that data until August 13, 2019, when the phone stopped transmitted location data. In the interim, agents received location data indicating that PADILLA was staying in the area of 2020 N. Grand Ave, Las Vegas, NM 87701. Agents canvassed the area, and learned the approximate location of the pings from PADILLA's phone were near a Best Western Hotel. Agents served administrative subpoenas on the Best Western and learned that PADILLA was registered as the occupant for room 110-A from August 9 to 12, and August 13 to 14.

37.     On August 9, 2019, Judge Ritter signed a warrant authorizing DEA agents to search and seize PADILLA's Yukon (19-mr-958). On August 12, 2019, agents instructed a private tow company to tow the Yukon pursuant to the warrant. The tow company towed the vehicle from the public street outside of PADILLA's residence at 8407 San Juan, Albuquerque, NM. Afterwards, agents searched the Yukon and discovered approximately $1,200 in U.S. Currency, rounds of .45, 9mm and .223 ammunition, a fully loaded Glock pistol magazine, and substances believed to be drug cutting agents. Agents also found various financial documents showing cash deposits. Agents believe the evidence discovered is indicative of the drug trafficking trade. Shortly after the search, the same day, PADILLA called the private tow company and inquired as to the reason for the tow. When the dispatcher attempted to transfer PADILLA to someone who could answer his question, PADILLA terminated the call. That night, agents observed PADILLA's phone ping location data showing him driving south from Las Vegas, NM, toward Albuquerque, NM, until around Rowe, NM, at which point the location data showed PADILLA returning to Las Vegas, NM. The next

day, PADILLA's phone ceased transmitting location data. Agents believe that PADILLA has become suspicious of law enforcement actions, and is now hiding at the **HOTEL ROOM**. Incidentally, on August 13, 2019, a source of information called the DEA main line in Albuquerque to report PADILLA as a drug dealer. This person claimed to have been hooked on drugs by PADILLA. This person also claimed PADILLA was currently "laying low" in Las Vegas, NM.

38.    On August 14, 2019, the Best Western hotel list for occupants did not show PADILLA or MARTINEZ as occupants. But that same day, a DEA Task Force Officer ("TFO") observed MARTINEZ's Jeep Grand Cherokee parked in the hotel parking lot in the morning. Later, the TFO observed the Jeep Grand Cherokee at MARTINEZ's place of employment, Wells Fargo Bank in Las Vegas, NM. That same day, the TFO observed the black Corvette associated with PADILLA parked alongside a house located at 901 Commerce St., Las Vegas, NM, approximately 1 mile from the **HOTEL ROOM**. At the end of the workday, the TFO observed the Jeep Grand Cherokee leave the Wells Fargo. At approximately 5:30 am on August 15, 2019, I observed the Jeep Grand Cherokee parked again in the Best Western parking lot. On August 15, 2019, the Best Western hotel provided agents a list of occupants showing room 310-A is rented to Sharlett MARTINEZ, from August 14 to August 15, 2019, for two adults and no children. As of 10:40 am, MARTINEZ's Jeep Grand Cherokee is still parked in the hotel parking lot.

### *Recent Information Regarding Drug Trafficking*

39.    Another CS, who has provided reliable and accurate information on several investigations, told agents that PADILLA and the CS discussed the purchase of illegal drugs within the last two weeks. Agents verified the CS's information by listening to an audio recording from the CS's phone. This CS is also working for consideration on potential criminal charges involving

drug trafficking. Agents believe the CS's information to be truthful based on prior interactions, previous successful operations, and corroboration of information provided by the CS.

## CONCLUSION

40.     Based on my training and experience, I believe that the **HOTEL ROOM** is being used as a hiding location for PADILLA from law enforcement, and that the **HOTEL ROOM** is being used to conceal evidence of PADILLA's drug trafficking.

41.     I further assert there is probable cause to believe that at the **HOTEL ROOM** will be found evidence, instrumentalities, and the fruits of violations of 21 U.S.C. §§ 841(a)(1) and 846, distributing and possessing with intent to distribute a controlled substance and conspiracy to commit these offenses, as described in Attachment B. I further believe that the items listed on Attachment B, and incorporated into this Affidavit by reference, may be found at the premises to be searched. I base this belief on the information set forth above, my training and experience, and the experience of the law enforcement officers with whom I has consulted.

42.     Furthermore, in a number of residential searches in prior investigations that my office has been involved in, these enumerated types of evidence have typically been recovered from the main residence and in addition, from other structures and areas on the property being searched, as for example, other storage lockers/areas, detached closets, containers, and yard areas

associated with the main residence and used in connection with or within the curtilage of said residential property.

Respectfully submitted,

*By telephone (JR)*

Thomas D. Long
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me this 15th day of August, 2019.

*By telephone.*

THE HONORABLE JERRY H. RITTER
UNITED STATES MAGISTRATE JUDGE

17

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

Room 310-A, at Best Western Plus Montezuma Inn & Suites, located at 2020 N. Grand Ave., Las Vegas, NM 87701 ("the **HOTEL ROOM**"). The Best Western Plus is shown in the photograph below.



The location of the HOTEL ROOM, on the third floor, is circled on the following room chart.



18

## ATTACHMENT B

## PROPERTY TO BE SEIZED

1. Controlled substances, including, but not limited to, methamphetamine, heroin, cocaine, crack cocaine, oxycodone pills, fentanyl pills, and marijuana.

2. Drug paraphernalia, including but not limited to, scales, packaging materials, items for packaging and handling drugs.

3. Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions.

4. Cellular telephones and smartphones.

5. Any and all drug customer lists, drug records, dealers lists, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or dealers, and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

6. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

7. Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other telecommunications instruments used by them and/or their drug trafficking associates.

8. Indications of ownership or control over the vehicle to be searched, including but not limited to, titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

9. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

10. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

11. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

12. Photographs or video movies of the drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

13. Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

14. Any and all computers and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B.

15. Firearms, ammunition, and gun powder residue.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

The terms "storage medium" or "storage media" include any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.